1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   HECTOR TORRES,                          No.  2:20-cv-02241-MCE-JDP

12              Plaintiff,

13        v.                                 **AMENDED MEMORANDUM AND ORDER**

14   AMERICAN WATER WORKS                    **(NUNC PRO TUNC TO MARCH 29, 2023)**
     COMPANY, INC., et al.,
15
                Defendants.
16

17        Through the present action, Plaintiff Hector Torres ("Plaintiff" or "Torres") seeks

18   relief from Defendants California American Water Company and its parent, American

19   Water Works Company, (together the "Company") and International Union of Operating

20   Engineers, Stationary Local Number 39, (the "Union") (collectively "Defendants") for

21   wrongful discharge in breach of a labor agreement and breach of the duty of fair

22   representation, respectively.  Compl., ECF No. 1 ¶ 1.  The Company terminated Plaintiff

23   after conducting an investigation and concluding that Plaintiff had sexually harassed a

24   junior female colleague, who was also a member of the Union.  The Union initially

25   represented Plaintiff through the grievance process but decided not to pursue the

26   grievance through private arbitration.

27   ///

28   ///

                                        1

Presently before the Court is a Motion for Summary Judgment filed by the Company, ECF No. 22, in which the Union has joined, ECF No. 24.  Plaintiff timely filed an Opposition.  ECF No. 28.  For the following reasons that Motion is GRANTED.[1]

**BACKGROUND**[2]

### A.     General Background

Plaintiff was employed by the Company in a Senior Field Service Cross Connection position in which he was responsible for inspecting water backflow for commercial properties.  During the relevant time period, Plaintiff was 49 years old, was married, and had three daughters, two who were in their twenties and one who was in her teens.

The Company also employed Ashley Stahl ("Stahl") as a Water Distribution Meter Operator assigned to its Sacramento office location.  In that position, Stahl was responsible for replacing commercial and residential water meters.  At the time of the events at issue, Stahl was a 28-year-old single woman with a boyfriend.  Plaintiff did not supervise Stahl, but he held a more senior role than she did.  The two employees were familiar with each other because in Stahl's prior position as a Field Service Representative, Torres would occasionally help her locate meters.

Both Plaintiff and Stahl were members of a collective bargaining unit exclusively represented by the Union.  The Union and the Company were in turn parties to a collective bargaining agreement ("CBA" or "Agreement") governing the terms and conditions of employment for bargaining unit employees.

///

///

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

[2] The following material facts are undisputed and, unless otherwise indicated, are taken, often verbatim, from the parties' papers.

2

According to one of the Company's policies, it is "committed to a workplace in which all individuals are treated with mutual respect and dignity." St. Clair Decl., ECF No. 22-3, ¶ 15, ECF No. 22-4, Ex. 14 at 1. That policy further provides that:

> [The Company] has zero tolerance for discrimination, harassment or retaliation as described in this policy. This means the Company will not tolerate any form of discrimination, harassment or retaliation by or towards any employee, vendor, customer, or other person in our workplace. Also, such behaviors are not allowed at a customer location, while operating a company vehicle, in public locations, or on our job sites. This policy also prohibits discrimination, harassment or retaliation while on Company business trips, or at business related social events or at any time outside of work. It is important to understand that discrimination, harassment and retaliation that occurs outside of work is still prohibited by this policy because it may impact the Company, its reputation or its name. A guiding principle of your employment with the Company is to treat everyone with respect and dignity and always be professional and courteous.

Id. "Sexual harassment" is further defined as follows:

> For purposes of this policy, sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual or gender-based nature when:
>
> • submission to such conduct is either explicitly or implicitly made a term or condition of an individual's employment; or
>
> • submission to or rejection of such conduct is used as the basis for employment decisions affecting the individual; or
>
> • such conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.
>
> Some examples of what may constitute sexual harassment are: threatening or taking adverse employment action, such as discharge or demotion, if sexual favors are not granted; demands for sexual favors, whether or not in exchange for favorable or preferential treatment; unwelcome and repeated flirtations, propositions or advances; unwelcome physical contact; whistling; leering; improper gestures; offensive, derogatory or degrading remarks; unwelcome comments about appearance; sexual jokes or use of sexually explicit or offensive language; gender or sex-based pranks; the display of sexually suggestive objects or pictures in work areas; and the communication of any of the above via any electronic means, including via text messages or internet/social media postings. This list of examples is not intended to be all-inclusive.

1  Id. at 3.  "Other discriminatory harassment" is defined as:

2
3
> verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of any protected characteristic, and that:

4
5
> • creates an intimidating, hostile, or offensive work environment; or

6
> • unreasonably interferes with an individual's work performance

7  Id. at 4.  The Company's policies specify that "[a]ny employee who violates or

8  circumvents [the sexual harassment policies] may be subject to disciplinary action up to

9  and including termination."  Id., Ex. 15 at 7.

10      The Company conducts training for all its employees on the prevention and

11  reporting of sexual harassment.  Plaintiff acknowledges having received and reviewed all

12  of the Company's policies, including the Workplace Conduct and Behavior Policy, and

13  Respect and Dignity in the Workplace Policy (hereinafter the "Company's Conduct

14  Policies").  Torres also acknowledges participating in the Company's sexual harassment

15  prevention training and Code of Ethics training.

16      **B.  The Harassment Allegations in this Case**

17      On February 5, 2020, Stahl told her foreman Osvaldo Perez about an encounter

18  she had with Plaintiff.  According to Perez, Stahl had advised him that on a particular

19  occasion, Plaintiff had reached into Stahl's back pocket, taken her cell phone, looked

20  through pictures of Stahl in which she was naked or in a state of undress, refused to give

21  the phone back to Stahl, and forced her to yank it out of his hands to retrieve it.  Plaintiff

22  also purportedly asked Stahl to see additional pictures the following day.  Stahl did not

23  ask Perez to report this incident to management, but he nonetheless reported it to his

24  supervisor, Terry Coleman, that same day.

25  ///

26  ///

27  ///

28  ///

4

1    The following day, Coleman and Christina Baril, an Operations Manager, met with

2  Stahl.  According to the notes of that meeting:

3           Ashley stated that Hector "Tito" Torres and she had been
             friendly since she had been in conservation, but noticeably
4            more when she moved to the Field Service Department.  They
             conversed as friends, and she would previously call him for
5            assistance locating meters when she was out in the field.
             Ashley noticed that Hector's tone changed with her, and
6            became more friendly, when he found out that Ashley and her
             previous partner had split in late February 2019.  Hector would
7            make comments about Ashley's appearance such as "Oh, are
             you wearing makeup for your boyfriend?"  Ashley recalled
8            being mildly uncomfortable, but stated she just figured that
             Hector was a "lonely guy", and she pushed it off.
9
             In Summer 2019/Fall 2019, Ashley stated that Hector had
10           called her on her personal phone on a Friday (her day off)
             around lunchtime.  Ashley did not answer.  The following
11           Monday morning at the office, Hector saw Ashley and stated
             something to the effect of "I called you on Friday.  Why didn't
12           you answer, I was by your house, but I didn't know if your
             boyfriend was there."  Ashley had told Hector that it wouldn't
13           have mattered if her boyfriend was there, and that Hector could
             have stopped by, as she viewed Hector as a friend.
14
             Ashley left for Hawaii on October 21st, 2019, and returned
15           roughly around October 28th, 2019. The morning of October
             28th, after the morning meeting for the FSR/Meter Crew,
16           Ashley walked back to her truck, and passed by Hector's
             cubicle.  Ashley stated that Hector said "Hey how was Hawaii
17           – let me see some pictures".  Ashley informed Hector that she
             had posted photos on Facebook and he could see them there.
18           Hector then reached into Ashley's back pocket and took her
             personal phone.  Hector opened up Ashley's phone to see
19           personal private photos.  Ashley tried to grab the phone from
             Hector, while he was stating "let me see more, let me see
20           more", and trying to scroll through more pictures.  She grabbed
             the phone and then informed Hector "You can't do that".
21           Ashley stated that she had to go, and then went back to her
             work vehicle.  While walking to her work vehicle, Ashley spoke
22           with Alex Brett about the incident.    Alex and Ashley
             corresponded about the event via text, and Ashley believes
23           she remembers Alex telling her that she should report it.

24           On October 29th, Ashley was walking to her work vehicle in the
             back, and Hector came out of the office.  Hector walked over
25           to Ashley as she was walking to her truck, and Ashley recalled
             him stating something along the lines of "I need a wake me up,
26           I need to see more pictures".  Ashley believes she ignored
             Hector or told him that she had to go to work.  Ashley told her
27           boyfriend, Rene, that day about her interaction with Hector.
             Ashley had previously told Rene about Hector, and that he had
28           made her uncomfortable before the incident on the 28th/29th.

Rene reached out to Hector on the 29th, via Facebook messenger.  Ashley does not know exactly what Rene said to Hector, but believes that it was along the lines of Hector needing to stop doing what he was doing, and that it could have potentially been mildly threatening.  Ashley does not know if Hector received the message, nor does Rene, as Rene blocked Hector after sending the correspondence.  Since October 29th/the message sent by Rene, Hector does not speak to Ashley.

Ashley stated she feels uncomfortable around Hector, and if he is in a room, such as the field services room, she will leave if there is potential that it will be just him and her.

Pl.'s Ex. E, ECF No. 28-3.

Following this meeting, Human Resource Business Partner Kimberly Castillo contacted Virginia "Gini" Russo ("Russo"), Employee Relations Business Partner, and asked Russo to investigate Stahl's report.  Russo began her investigation by reviewing the notes Baril and Coleman had made during their meeting with Stahl and preparing questions for her investigation.  She then interviewed Perez, Brett, Stahl, Torres, and Stephen San Nichols, the GIS Project Manager in the Company' Sacramento GIS Technical Group.

In Russo's final investigative report, some of the details of the allegations to be investigated were slightly different from those set forth in the February 6, 2020, meeting. St. Clair Decl., ECF No. 22-3, ¶ 19; 22-4, Ex. 18.  Russo's "Summary of Allegation" section provides:

On 2/5/2020, Osvaldo Perez was riding with his employee, Ashley Stahl.  During the ride along, Stahl reported an alleged Code of Ethics violation to include sexual harassment.

Stahl claims that on 12/06/2019, Hector Torres called her personal phone on Friday (her day off) around lunchtime. Stahl did not answer.  The following Monday morning, Torres saw Stahl and stated something to the effect of "I called you on Friday.  Why didn't you answer, I was by your house, but I didn't know if your boyfriend was there."  Stahl viewed Torres as a friend and told Torres it wouldn't have mattered if her boyfriend was there.

On 12/11/2019, Stahl claims Torres asked to see pictures of her motorcycles.  Stahl and Torres are friends on Facebook (FB), so Torres knew Stahl liked or had motorcycles.  Stahl took out her phone to let Torres see photos.  When Torres

6

scrolled through, he came across private (naked) photos of Stahl. Stahl grabbed her phone and said, "you can't do that" and placed her phone in her back pocket. Torres grabbed Stahl's phone out of her pocket while saying "let me see more, let me see more." Stahl eventually retrieved her phone and said she had to go and headed off to her work truck. While walking to her truck on, she spoke to her coworker Alex Brett about the incident. Stahl also texted her Mom about the incident. See attachment #2 & #3.

On 12/12/2019, Stahl says she was walking back to her work truck and Torres came out of his office and said, "I need a wake me up/ I need to see more pictures." Stahl believes she ignored Torres or told him she had to go to work.

Stahl told her boyfriend about the incident that occurred on 12/12/2019 and he was aware that Torres had previously made her uncomfortable. Stahl's boyfriend messaged Torres via FB messenger and told Torres to leave Stahl alone. See attachment.

Stahl says that Torres hasn't contacted her since 12/12/2019. Stahl states she avoids potential interaction with Torres. If he is in the break room, she heads the opposite way.

If the incident is substantiated, it violates several American Water policies: Code of Ethics, Respect & Dignity in the Workplace Policy and the Code of Conduct.

1   <u>Id.</u>  Russo obtained copies of the text exchange between Stahl and her mother and of

2   the message Stahl's boyfriend had sent to Plaintiff:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20





21

22

23

24

25

26

27

28

Id.

During Russo's interview with Stahl, she observed that "there was a discrepancy in [Stahl's] original statement vers[u]s what was stated in [Stahl's] interview." Id. Russo explained:

> Stahl had her vacation dates to Hawaii confused. She initially thought she took vacation in October but later confirmed it was December. Her vacation dates were confirmed by Coleman, Operations Supervisor. Stahl took vacation from 12/16/19-12/20/19.

Id. Perez and Brett nonetheless corroborated the material aspects of Stahl's allegations:

> Osvaldo Perez reported the incident. He noted Torres would go out of his way to help Stahl. He said it wasn't common practice for Torres to help others, especially men. Perez states that Torres was overly friendly towards Stahl, and everyone picked up on this. He stated that Torres could see where Stahl parks and it seemed like Torres was constantly going out to see Stahl. Perez said Stahl and Torres did not have a relationship outside of work. He says that Torres no longer talks to Stahl.

> Alex Brett confirmed Stahl spoke with him about the incident. Brett verified the incident occurred before Stahl went on vacation. The motorcycle incident Stahl recounted including grabbing her phone out of her back pocket was corroborated by Brett. Brett confirmed Torres approached Stahl the following day and said something to the effect of "I need some motivation for my morning" (eluding to the photos). Brett substantiated that Stahl's boyfriend sent a message to Torres via FB messenger. Brett said Stahl and Torres did not have a relationship outside of work. Brett said Stahl was avoiding Torres and concerned that Torres could potentially be promoted and worried about retaliation. Brett also stated that he was aware of past inappropriate behavior by Torres where he acquired female's phone numbers without their permission, most likely through paperwork at [the Company].

///

///

///

///

///

///

///

9

1  Id.  Russo also interviewed Plaintiff.[3]  According to Russo, Plaintiff admitted seeing the

2  photos of Stahl, but contends he immediately returned the phone to her:

3      Hector Torres admitted to seeing private photos.  However, he

4      claims there were two separate incidents.  He claims that he asked Stahl to see photos when she returned from vacation to

5      Hawaii.  Torres said he asked to see photos of her vacation and Stahl handed him the phone.  Torres says when he saw

6      the naked photos, he went whoa, and handed the phone back to her.  Torres claims this is when he said, "Are those your

7      boyfriend's inspirational wake up photos."   Torres denies reaching into Stahl's back pocket.  Torres also denies ever

8      receiving a message via messenger on FB.  He scrolled through his phone for Russo and Coleman to view.  Torres

9      admits that at one point he had a conversation about motorcycles but claims it was a different/separate time from

10     when he saw the private photos.  Torres claims he had no relationship with Stahl outside of work.

11 Id.[4]  Plaintiff did not offer any of his own evidence or identify any witnesses that might

12 have proffered exculpatory information on his behalf.

13     Russo next interviewed San Nichols, who provided information to Russo about an

14 alleged prior incident with a different female employee:

15     Stephen San Nichols, GIS manager, was interviewed because

16     he had a prior employee in his department complain to him about Torres.  San Nichols states that at one point, he

17     mentioned Torres in conversation to the former temporary employee, Leticia Cardenas and she got a disgusted look on

18     her face.  When San Nichols asked Leticia about it, she stated that Torres kept texting her to go out.  San Nichols offered to

19     report it to HR, but Leticia said, no, that she had handled it herself by blocking his number.

20 Id.  Finally, Stahl was interviewed again and confirmed there was one incident and it

21 occurred before she went on vacation.  Id.

22     Russo ultimately concluded that Stahl's claims were substantiated and

23 recommended terminating Plaintiff:

24 ///

---

[3] Because Plaintiff was represented by the Union, he was accompanied during this interview by his Union steward.

[4] According to Russo's notes of this conversation, Plaintiff did not remember calling Stahl on her day off but advised that he did go by Stahl's house one time and he "just knows" where she lives.  Russo Decl., ECF No. 22-6, Ex. 2.  Plaintiff notes now that Stahl was unable to provide her phone records at her deposition and testified later that she was unsure if Plaintiff had called her.

The claim of alleged harassment is substantiated.   Torres made inappropriate actions and unwelcome comments toward Stahl.   Stahl's text messages to her Mom along with the message on Facebook provide credibility of sexually harassment.  Brett verified that the incidents took place before Ashley went on vacation as do the text messages and Facebook message.  This suggests that Torres is falsifying the truth about when the incident occurred and about there being two separate events.   Brett confirmed Ashley's claim that Torres took the phone out of her back pocket.   Brett also corroborated that Torres approached Stahl when she was walking to her truck and made a statement like "I need some motivation for my morning" which Brett says was eluding to the photos.  The witnesses also support the idea that Torres was "overly friendly" and "went out of his way" to speak with Ashley.

. . . .

Recommend termination of Torres' employment due to his violation of the Company's Respect and Dignity in the Workplace Policy and Code of Ethics.

Id.

Russo's report was forwarded to Stephen "Audie" Foster, Director of Northern Operations for California American Water Company, who reviewed and considered its findings and made the decision to terminate Torres' employment because Torres violated the Company's sexual harassment policy and "[c]reated an environment for a fellow employee that made them u[n]comfortable in the workplace and that rose to the levels of sexual harassment."  Id. ¶ 6, Ex. 5 (Foster Depo. 8:24-9:2, 12:22-24, 14:6-8, 18:19-21).

///

///

///

///

///

///

///

///

///

11

1

**C.   The CBA and the Union's Grievance Contesting Plaintiff's Termination**

2

3

The CBA sets forth the rights of the Company to manage their business as

follows:

4

5   The Company has and will retain the exclusive right and power
to manage its business and direct the working forces, including
6   the right to hire, classify, grade, suspend, reassign, lay-off,
discharge, promote, demote or transfer its employees,
7   provided it does not conflict with the provisions of this
Agreement. Nothing in this Agreement is intended to or is to
8   be construed in any way to interfere with the recognized
prerogative of the Company to manage and control the
9   business, but each employee covered by this Agreement shall
possess the right to appeal through the grievance and
10   arbitration procedures as provided by the terms of this
Agreement.

11   Id., ¶ 14, Ex. 13. The CBA does not contain any provisions explicitly granting employees

12   just or good cause protections from discipline or discharge. It seemed to be a common

13   understanding, however, that employment could only be terminated for "just cause" or

14   "good cause." See, e.g., Pl.'s Exhibits, ECF No. 28-4, Ex. J at 13:19-14:6; Ex. K; Ex. M

15   at 26:21-27:10; Ex. N; Ex. T at 4:11-15, 19:17-20:06.

16   Article 5 of the CBA sets forth a grievance procedure available to resolve

17   differences "between the parties to [the] Agreement regarding the interpretation or

18   application of any of the terms contained herein or discipline of any employee covered

19   by this Agreement . . . ." Id., ¶ 14, Ex. 13. The Grievance Procedure consists of three

20   steps. Steps One and Two involve presentation of a written grievance to varying levels

21   of management for discussion to determine whether the matter can be resolved. Id.

22   The final step, Step Three, provides for a Board of Adjustment ("BOA" or "Board")

23   consisting of two representatives from both the Company and the Union. The BOA

24   reviews relevant documents, hears presentations from the Company and the Union,

25   discusses the matter amongst the members and renders a decision on whether, in the

26   case of discipline, the Company's decision should be confirmed or modified. The CBA

27   then provides that:

28   ///

> A decision of the Board must be made within ten (10) days of the close of its meeting. Should the Board be unable to arrive at a majority decision within these ten (10) days, then a fifth, disinterested member shall be chosen by the Board within fifteen (15) days of the close of its meeting, and the majority decision, which shall be reached within fifteen (15) days of the appointment of the fifth member, shall be final and binding upon the parties.
>
> If the Board is unable to agree upon a fifth member within the specified time, then the entire dispute shall be submitted to arbitration under the Voluntary Labor Arbitration rules in effect with the American Arbitration Association (AAA). Written submission to AAA, plus a copy to the other party, must be made within twenty (20) days of the close of the Board's meeting. The decision of the arbitrator shall be final and binding upon the parties. The arbitrator shall have the power to interpret the provisions of this Agreement, but shall not have the power to add to or subtract from this Agreement, nor to suspend, amend, or change any provision of this Agreement, nor to imply an obligation upon either party not set forth in an express provision of this Agreement. The arbitrator may not make an award retroactive beyond fifteen (15) days prior to the date the grievance was submitted at Step One.

Id.

On February 25, 2020, pursuant to the terms of the CBA, the Union timely filed a grievance on Torres' behalf claiming that he was terminated without cause and requesting that the Company reinstate him. The Union also requested the appointment of a BOA.

On March 3, 2020, the Company denied Torres' grievance, stating that it had terminated Torres for his violation of the Company's Conduct Policies. The Company informed the Union. Torres requested that the Union further dispute the Company's decision. On March 12, 2020, Eddie Ramirez, Business Representative for Local 39, requested a BOA to determine whether the employer's termination decision should be reversed. Ramirez requested a legal opinion from Gary Provencher, a Union lawyer who had represented the Union for many years. Specifically, Ramirez asked Provencher to opine on whether, "[i]n the event the BOA does not come to a favorable conclusion, would there be a chance to prevail in arbitration?"

///

1    The BOA took place virtually on April 14, 2020, and lasted one to two hours.  The

2  Union appointed Business Representatives Brandy Johnson and Joe Klein to serve as

3  its representatives on the BOA, whereas the Company appointed Brian McCord, Director

4  of Health & Safety, and Evan Jacobs, Director of Government Affairs.  The BOA meeting

5  started with Foster presenting the Company's case and advocating that the termination

6  stand.  Ramirez then presented the Union's case advocating reversal of the Company's

7  decision and for Plaintiff's reinstatement.  Plaintiff and Russo were both present during

8  the BOA to answer any questions from the BOA members.  After the presentations,

9  Plaintiff, Ramirez, Foster, and Russo then left the meeting, and the BOA members

10  began their deliberations.  The Union representatives "vehemently" advocated for

11  Torres.  The Company representatives argued that Torres' statements were inconsistent

12  with the facts whereas Stahl's statements were supported by contemporaneous

13  evidence.  The Union's representatives voted to reinstate Torres, the Company

14  disagreed, and the BOA ended in a deadlock.  Ramirez told Plaintiff that the BOA had

15  not reversed his termination and that he would speak to the Union's lawyer about next

16  steps.

17    On May 6, 2020, Provencher provided the Union with his legal opinion:

18    [I]t is my opinion the Union would not be successful in
   arbitrating this matter because, as explained below, Mr.

19    Torres' version of the events is simply not possible.
   Consequently, if arbitrated an arbitrator would almost certainly

20    credit Ms. Stahl's testimony over Mr. Torres and uphold the
   termination.

21

22    The employer alleges that Mr. Torres asked to see pictures of
   a motorcycle on Ms. Stahl's phone in December 2019.  When

23    Ms. Stahl pulled out her phone, the employer alleges that Mr.
   Torres grabbed the phone and began scrolling through her

24    pictures.  While doing so, Mr. Torres came across sexually
   explicit photos of Ms. Stahl. Ms. Stahl then grabbed her phone

25    from Mr. Torres and put it in her pocket.  Mr. Torres then
   grabbed the phone out of her pocket and said words to the

26    effect of "let me see more."  Ms. Stahl took her phone back
   from Mr. Torres.  Ms. Stahl then spoke to her co-worker Alex

27    Brett about the incident on the day it occurred and she text
   messaged her mother about the incident the same day.  The

28    next day, Stahl alleges that Mr. Torres stated to her, "I need a
   wake me up. I need to see more pictures."

14

Mr. Torres acknowledges that he did come across sexually oriented photos of Ms. Stahl on her phone, but the incident occurred while Ms. Stahl was showing him photos of her vacation to Hawaii. However, this is impossible because Ms. Stahl had not gone on vacation to Hawaii at the time of the incident. In the documents I reviewed with the legal request is a text conversation between Ms. Stahl and her mother on December 11, 2019 discussing a co-worker taking her phone without her permission and looking at naked pictures of her. I have also reviewed a copy of Ms. Stahl's holiday and vacation records. According to those records, Ms. Stahl began her vacation on Monday, December 16 and returned the following week. Thus, Ms. Stahl could not have been showing Mr. Torres pictures of Ms. Stahl's Hawaii vacation on December 11, because Ms. Stahl did not go on vacation until the following week. Additionally, in the December 11 email exchange with her mother, Ms. Stahl mentions motorcycles and pictures, but makes no mention of Hawaii.

In summary, if arbitrated, Mr. Torres will not be a credible witness for the reasons explained above. Moreover, it does not appear that he has anybody that witnessed the incident that will testify on his behalf. On the other hand, Ms. Stahl does have text messages to her mother on December 11, the day the incident allegedly occurred, discussing the incident. She also spoke to a co-worker about the incident on the day it occurred. Thus, an arbitrator will certainly find that the incident occurred on December 11. The employer will also introduce vacation records showing that Ms. Stahl began vacation on December 16, the week after the alleged incident. Therefore, an arbitrator would conclude that it was impossible for Ms. Stahl to be showing Mr. Torres pictures of her vacation when the incident occurred, as stated by Mr. Torres, because Ms. Stahl had not been on vacation at the time the incident occurred. Accordingly, an arbitrator will almost certainly find against Mr. Torres and uphold the termination.

Id., ¶ 26, Ex. 25.

Ramirez thereafter verbally informed Torres that the Union would not be moving forward with his grievance. According to the Union, this conversation occurred on May 7, 2020. Plaintiff, however, remembers having the conversation during the week of his wife's birthday, which is June 2. He thus believes this conversation occurred during the last week of May or the first week of June. In any event, no fifth BOA member was selected, and the Union did not submit the case to arbitration. Union counsel testified that he was not aware of any instance where the Company or the Union has ever selected a fifth disinterested BOA member to resolve a grievance.

15

1    More specifically, Provencher testified in this case regarding the parties' past

2  practices with regard to arbitration under the CBA:

3          Q.  Right.

4          In your experience as a union attorney, it's not uncommon, is
5          it, for the parties to have ways of dealing with each other that
           might not be spelled out like a statute, for example, that
6          [Plaintiff's counsel] may be more familiar with, employment
           statutes and laws, etc.?

7          In other words, there's a law of the shop that kind of develops
8          around Collective Bargaining Agreements between the
           parties?

9          A.  Yeah.

10         That's called "past practices," and there's lots of past practices
11         that are not necessarily consistent with the MOU that
           employers and parties operate under.

12         Q.  Okay. And in regards to this particular contract, I think I
13         heard Mr. Florence say yesterday that it's not always the case
           that a split Board of Adjustment goes and finds an independent
14         Board member.

15         A.  Are you asking if that's -- if I have that same understanding?

16         Q.  Yes.

17         Do you have the same -- in other words, [Plaintiff's counsel's]
18         contention is that because it says the "Board shall" that in all
           cases, that must be what happens?

19         A.  No, that's -- that's absolutely incorrect.

20         So I think your question was: Is it common, when you have
21         these -- is it common that you don't have a fifth, disinterested
           or some -- I'm sorry.

22         . . . .

23         Q.  Do you share Mr. Florence's understanding that the Board
           of Adjustment, when it splits, does not always appoint a fifth
24         member --

25         . . . .

26         A.  Yes, I absolutely agree with Mr. Florence, and in fact, I will
           just say this.

27         I've done hundreds of legal opinions.

28         I've done over 100 arbitrations.

16

1    I have never seen a Board of Adjustment tie and then go to
2    somebody else -- and grab someone else and say, "This is an
     impartial."

3    This is a weird provision in -- to even have in a contract.

4    Q.  Right.

5    A.  I'm unaware that American Water and the union have ever
     selected a fifth, disinterested; I don't believe they do.

6
7    I believe what they do is -- that the next step in this is if the
     Board is unable to agree on a fifth, then the entire dispute shall
     be submitted to arbitration under the Voluntary Arbitration
8    Rules; so then it would go to arbitration.

9    But even then, the entire dispute "shall be" -- so I know I'm kind
     of giving a narrative on this, but I need to be clear.

10
11   That "five days" really means nothing to me, and the next thing
     is that it "shall be" submitted.

12   So that is the type of language that we see in a normal MOU
     usually, is that it shall be submitted; right?

13   Q.  Okay.

14
15   A.   That doesn't mean that the union has to submit every
     grievance to arbitration.

16   Q.  Okay.

17   A.  This "shall" is the employer and the union agree that if union
     wants to keep going through the process, this is how the
18   process is.

19   But once they do that Board of Adjustment, they have the right
     to go to their attorney, their Legal Department, and say: Should
20   we move on any further?

21   If they make the decision to move on further, then the employer
     has to move on with them, but the union absolutely has the
22   right to stop in the grievance process any time it finds that its
     grievance does not have merit.

23
24   That's exactly what they did in this contract, and that's exactly
     how it works everywhere I've been . . .

25   ///

26   ///

27   ///

28   ///

1   Q. Right, okay.

2   In that regard, [Plaintiff's counsel] or Plaintiff has suggested, I
    think, in the Answers to Interrogatories and in the complaint
3   itself, that although the employer was the decision maker, that
    it, the employer, was obligated, when the union didn't pursue
4   arbitration, to go itself and engage with AAA to have an
    arbitration about whether it made the right decision.

5
    Have you ever, in your years of practicing labor law,
6   understood or seen anything like that or heard of anything like
    that?

7
    A.  Well, like I said, I don't select arbitrators; the Arbitration
8   Department does that.

9   But I do receive letters saying that -- you know from the
    Arbitration Department, saying: We're selecting arbitrators.
10
    I can't recall ever seeing an arbitration request from an
11  employer; it's --

12  Q.  Right.

13  A.  -- always from the union.

14  . . . .

15  Q.  And it's your understanding of the law, rather, the duty of
    fair representation, that the union has the – has the right to
16  exercise that discretion, because it does represent the whole
    as opposed to individuals, to decide how to allocate the union's
17  resources on any particular grievance matter; correct?

18  A.  Absolutely.

19  They have a duty to spend them in a way that is thinking about
    the whole membership.
20
    Q.  Right.
21
    And without disclosing any privilege, it appears that the union
22  made that judgment -- made a judgment here?

23  A.  They sought my advice and agreed with my judgment.

24  . . . .

25  Q.  If you could look at Exhibit 5, the Collective Bargaining
    Agreement applicable to Mr. Torres --
26
    A.  Sure, sure.
27
    Q.  -- as far as you understood it, this was applicable to Mr.
28  Torres; correct?

18

1
    A.  Absolutely.

2
    Q.  Okay. If you look at page 9, under the category of "Step Three - Board of Adjustment" --

3
    A.  I'm there.

4
    Q.  -- I think you were talking about that just a minute ago.

5
    The second paragraph says, "A decision of the Board" -- again referring to the Board of Adjustment -- "must be made within ten (10) days of the close of its meeting.

6

7
    "Should the Board be unable to arrive at a majority decision within these ten (10) days, then a fifth, disinterested member shall be chosen by the Board within fifteen (15) days of the close of its meeting, and the majority decision, which shall be reached within fifteen (15) days of the appointment of the fifth member, shall be final and binding upon the parties."

8

9

10

11
    So are you saying that the word "shall" with regards to the selection of a fifth, disinterested member does not mean "shall"?

12

13
    A.  No.

14
    What I'm saying is that means if the union wants to go forward, it shall go forward in that way.

15
    Now, I guess if the -- if the employer wanted to go forward, it could go forward in that way, too, but I doubt the employer would ever want to go forward.

16

17
    But "shall" -- that's the process.

18
    If the parties continue the process, that's what it will do, but the union, after the Board, or at any time, has the right to seek legal advice and determine whether or not to go on.

19

20
    This is not a contract between Mr. Torres and the union, and this is not a contract between Mr. Torres and American Water; this is a contract between the union and American Water (indicating).

21

22

23
    Q.  Right.

24
    But if it was to be discretionary, that is if the selection of the fifth, disinterested member was to be discretionary -- if the parties had discretion on whether to do that, they could have put it into the agreement itself; right?

25

26
    They could have inserted that language?

27
    . . . .

28

THE WITNESS: I would like to know . . . how you would do that because this is -- if it was permissive, then the employer wouldn't have to go -- the employer wouldn't have to go to the -- they would be permitted or not seek a fifth, disinterested person; right?

So let's say the Board locks, and you were going to use some language like this -- it's the same thing; they may go to arbitration, and then the employer would say, "No, we don't want to go."

BY [Plaintiff's counsel]:

Q.  Well, there could have been language inserted saying that this decision is discretionary on the part of the union; correct?

. . . .

THE WITNESS: And it's just not -- that's not the way things are done . . . ; I've never seen that in a contract.

And the parties understand -- the parties know what this means. You may not, but the parties understand what this means.

It's -- it's clear what this means (indicating).

[Plaintiff's counsel]: Well, I'm –

THE WITNESS: [E]very contract that has an arbitration clause says that it shall be submitted to arbitration for a binding decision.

I don't know how many labor arbitrations you've done . . . , under a Collective Bargaining Agreement, but under your theory, every time I tell them not to go to arbitration, that would be an Unfair Labor -- or a failure to represent -- a violation of the duty of fair representation because all contracts say you "shall" go to the arbitration.

If they said you can and the parties are permitted, the employer would never do it.

This is how they are written, just go look at any Collective Bargaining Agreement . . . .

Id., ¶ 9, Ex. 8 at 50:7-61:23.

On June 23, 2020, the Company received a demand for arbitration submitted by Plaintiff's private counsel.  On June 29, 2020, the Company rejected the demand as untimely and considered the grievance withdrawn.  On November 9, 2020, Plaintiff initiated this lawsuit.

1

2

**STANDARD**

3        The Federal Rules of Civil Procedure provide for summary judgment when "the

4    movant shows that there is no genuine dispute as to any material fact and the movant is

5    entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> Celotex Corp. v.

6    Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

7    dispose of factually unsupported claims or defenses.  <u>Celotex</u>, 477 U.S. at 325.

8        Rule 56 also allows a court to grant summary judgment on part of a claim or

9    defense, known as partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party may

10   move for summary judgment, identifying each claim or defense—or the part of each

11   claim or defense—on which summary judgment is sought."); <u>see also</u> Allstate Ins. Co. v.

12   Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a

13   motion for partial summary judgment is the same as that which applies to a motion for

14   summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

15   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

16   judgment standard to motion for summary adjudication).

17       In a summary judgment motion, the moving party always bears the initial

18   responsibility of informing the court of the basis for the motion and identifying the

19   portions in the record "which it believes demonstrate the absence of a genuine issue of

20   material fact."  <u>Celotex</u>, 477 U.S. at 323.  If the moving party meets its initial

21   responsibility, the burden then shifts to the opposing party to establish that a genuine

22   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v.

23   Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co.,

24   391 U.S. 253, 288–89 (1968).

25   ///

26   ////

27   ///

28   ///

1    In attempting to establish the existence or non-existence of a genuine factual

2    dispute, the party must support its assertion by "citing to particular parts of materials in

3    the record, including depositions, documents, electronically stored information,

4    affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

5    not establish the absence or presence of a genuine dispute, or that an adverse party

6    cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The

7    opposing party must demonstrate that the fact in contention is material, i.e., a fact that

8    might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby,

9    Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

10   Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992). The opposing party must also

11   demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

12   such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

13   477 U.S. at 248. In other words, the judge needs to answer the preliminary question

14   before the evidence is left to the jury of "not whether there is literally no evidence, but

15   whether there is any upon which a jury could properly proceed to find a verdict for the

16   party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251

17   (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

18   As the Supreme Court explained, "[w]hen the moving party has carried its burden under

19   Rule [56(a)], its opponent must do more than simply show that there is some

20   metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore,

21   "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

22   non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1      In resolving a summary judgment motion, the evidence of the opposing party is to

2      be believed, and all reasonable inferences that may be drawn from the facts placed

3      before the court must be drawn in favor of the opposing party.  <u>Anderson</u>, 477 U.S. at

4      255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

5      obligation to produce a factual predicate from which the inference may be drawn.

6      <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), <u>aff'd</u>,

7      810 F.2d 898 (9th Cir. 1987).

8      **ANALYSIS**

9

10      Plaintiff alleges in his Complaint that:  (1) the Union breached its duty of fair

11      representation by failing to properly investigate Plaintiff's grievance, by failing to pursue

12      appointment of a fifth impartial BOA member, and by failing to pursue Plaintiff's

13      grievance in arbitration; and (2) the Company breached the CBA by terminating Plaintiff

14      without just cause, by failing to allow Plaintiff to pursue his grievance to a legitimate

15      conclusion, and by failing to take steps to secure appointment of a fifth BOA member.

16      Presently before the Court is the Company's Motion for Summary Judgment, in

17      which the Union joined.  Defendants move for judgment on the basis that:  (1) the claim

18      against the Union is time barred because Plaintiff was made aware that the Union would

19      not further pursue his grievance on May 7, 2020, when the Union claims it so advised

20      him, but he waited until over six months later to file this lawsuit; (2) that claim fails in any

21      event because the Union's decisions were not arbitrary, discriminatory, or in bad faith;

22      and (3) the Company did not violate the CBA by terminating Plaintiff because he was an

23      at-will employee, but regardless, even if a good cause or just cause requirement was

24      implied in the CBA, his termination met that standard as well.

25      ///

26      ///

27      ///

28      ///

1    The basis for bringing actions like this one is well settled:

2         It has long been established that an individual employee may
3         bring suit against his employer for breach of a collective
          bargaining agreement.   Smith v. Evening News Assn., 371
4         U.S. 195 (1962).  Ordinarily, however, an employee is required
          to attempt to exhaust any grievance or arbitration remedies
5         provided in the collective bargaining agreement.   Republic
          Steel Corp. v. Maddox, 379 U.S. 650 (1965); cf. Clayton v.
6         Automobile Workers, 451 U.S. 679 (1981) 164 (exhaustion of
          intra-union remedies not always required).   Subject to very
7         limited judicial review, he will be bound by the result according
          to the finality provisions of the agreement.  See W.R. Grace &
8         Co. v. Local 759, —— U.S. ——, at ——, 103 S. Ct. ——, at
          ——, 75 L.Ed.2d ——; Steelworkers v. Enterprise Corp., 363
9         U.S. 593 (1960). In Vaca and Hines, however, we recognized
          that this rule works an unacceptable injustice when the union
10        representing the employee in the grievance/arbitration
          procedure acts in such a discriminatory, dishonest, arbitrary,
11        or perfunctory fashion as to breach its duty of fair
          representation.  In such an instance, an employee may bring
12        suit against both the employer and the union, notwithstanding
          the outcome or finality of the grievance or arbitration
13        proceeding.  Vaca[ v. Sipes, 386 U.S. 171 [(1967)]; Hines[ v.
          Anchor Motor Freight], 424 U.S. 554 [(1976)] ; [United Parcel
14        Service, Inc. v.] Mitchell, 451 U.S. 56 [(1981)], Bowen [v.
          United States Postal Service], 459 U.S. 212 [(1983)]; Czosek
15        v. O'Mara, 397 U.S. 25 (1970).  Such a suit, as a formal matter,
          comprises two causes of action.  The suit against the employer
16        rests on [29 U.S.C.] § 301, since the employee is alleging a
          breach of the collective bargaining agreement.   The suit
17        against the union is one for breach of the union's duty of fair
          representation, which is implied under the scheme of the
18        National Labor Relations Act.  "Yet the two claims are
          inextricably interdependent.  'To prevail against either the
19        company or the Union, . . . [employee-plaintiffs] must not only
          show that their discharge was contrary to the contract but must
20        also carry the burden of demonstrating a breach of duty by the
          Union.'"  Mitchell, 451 U.S. at 66–67 (Stewart, J., concurring in
21        the judgment), quoting Hines, 424 U.S. at 570–571.   The
          employee may, if he chooses, sue one defendant and not the
22        other; but the case he must prove is the same whether he sues
          one, the other, or both.  The suit is thus not a straightforward
23        breach of contract suit under § 301 . . . , but a hybrid § 301/fair
          representation claim, amounting to "a direct challenge to 'the
24        private settlement of disputes under [the collective-bargaining
          agreement].'"  Mitchell, 451 U.S. at 66 (Stewart, J., concurring
25        in the judgment), quoting [Auto Workers v.] Hoosier, 383 U.S.
          [696,] 702 [(1966)].

26   ///

27   ///

28   ///

24

1    Del Costello v. Int'l Brotherhood of Teamsters, 462 U.S. 151, 163-65 (1983) (footnote

2    omitted).  Because the Court concludes both that the Company did not breach the CBA

3    and that the Union did not breach its duty of fair representation, it holds that Defendants

4    are entitled to judgment as a matter of law.  There is no need for the Court to resolve

5    whether this action is timely.

6        **A.    Breach of contract**

7        Plaintiff contends that the Company violated an implied covenant in the CBA that

8    limits the Company's right to dismiss employees only on a finding of "just" or "good"

9    cause because his termination was tainted by Stahl's credibility issues and insufficient

10   facts to support the decision, especially given his long record of excellent service.  In

11   addition, according to Plaintiff, the conduct alleged is insufficient to rise to the level of

12   sexual harassment because it was not sufficiently unwelcome under a reasonable

13   person standard, and it was not severe or pervasive.  For its part, the Company asserts

14   that it has the express right to manage its affairs, that Plaintiff's employment was "at-

15   will," and that, in any event, the Company had good cause to discharge Plaintiff.

16       There is evidence in the record that, despite the lack of an explicit cause provision

17   set forth in the CBA, the parties proceeded as if such a clause existed.  Several

18   individuals so testified, and the existence of the grievance procedure seems to indicate

19   the parties anticipated terminations would occur only for specified reasons.  On the other

20   hand, the CBA contains clear language that "[t]he Company has and will retain the

21   exclusive right and power to manage its business and direct the working forces,

22   including the right to hire, classify, grade, suspend, reassign, lay-off, discharge, promote,

23   demote or transfer its employees, provided it does not conflict with the provisions of this

24   Agreement."  St. Clair Decl., ECF No. 22-3, ¶ 14; ECF No. 22-4, Ex. 13.  This language

25   contradicts the theory that a just cause finding is necessary.  The Court need not resolve

26   this issue, however, because, as argued by Defendants, even assuming a cause

27   requirement existed, Plaintiff's termination was justified.

28   ///

1    "The substantive law in a Section 301 suit for breach of a CBA is federal common

2    law." Mills v. Intermountain Gas Co., 857 F. Supp. 2d 1034, 1046 (D. Idaho 2012).

3    "'Just cause' is the embodiment of what is 'fair and reasonable, when all of the

4    applicable facts and circumstances are considered.'" Id. (quoting Power v. Kaiser

5    Found. Health Plan of the Mid-Atlantic States, Inc., 87 F. Supp. 2d 545, 555 (E.D. Va.

6    2000).  The Company's decision here was fair and reasonable as a matter of law.

7         Upon being notified of Stahl's allegations, a meeting was immediately set up with

8    Coleman and Baril, who thereafter referred the matter to Russo, a properly trained and

9    uninvolved human resources professional.  Russo conducted a thorough investigation,

10   interviewing multiple individuals and collecting evidence, and provided Plaintiff notice

11   and the opportunity to contradict Stahl's allegations.  Her conclusion that the allegations

12   were substantiated was reasonable given the fact that Stahl's version of facts was

13   substantiated by her contemporary statement to a Brett, her texts to her mother, and her

14   boyfriend's message to Plaintiff.

15        The fact that Stahl's recollection of inconsequential facts not central to her

16   allegations changed as her memory was refreshed (e.g., initially reporting the wrong

17   date and not remembering if she and Plaintiff were looking at vacation photos or photos

18   of motorcycles) does not change the Court's conclusion.  Nor is it dispositive that Stahl

19   could not produce records to show whether Plaintiff had called her on her day off at

20   some point or driven by her house.  At base, the issue was that Plaintiff saw private

21   photos of Stahl, refused to return her phone, and continued to question her about the

22   photos until Plaintiff's boyfriend reached out to him.  Independent witnesses also testified

23   regarding Plaintiff's behavior toward Stahl, and for his part Plaintiff has not offered any

24   independent evidence or any additional witnesses to contradict Stahl's allegations.

25   Since Plaintiff simply denied all of the alleged conduct, even in the face of this

26   corroborating evidence, Russo was justified in determining Plaintiff lacked credibility.

27   ///

28   ///

26

1    Moreover, nothing in the record suggests this investigation was conducted in bad

2  faith or that it was infected with bias.  Plaintiff disagrees with Russo's conclusions, and

3  points to imperfections in the process, but perfection is not the standard, and

4  imperfections do not automatically suggest partiality.  The Company gathered the

5  available evidence and reasonably evaluated it to determine that corroborating facts

6  supported the "she said" side of this dispute.  Having reached this conclusion, it was

7  more than reasonable for the Company to conclude that Plaintiff had engaged in sexual

8  harassment and/or conduct that was "immoral or indecent" under its policies as set forth

9  above.  Termination was thus reasonable.[5]

10    Plaintiff's argument that the conduct in this case does not rise to the level of

11  sexual harassment under federal sexual discrimination in employment standards (e.g.,

12  unwelcome to a reasonable person and sufficiently severe or pervasive) misses the

13  mark.  The Court is not being asked to determine whether Plaintiff and/or the Company

14  can be held civilly liable for Stahl's harassment.  The Court is thus not required to

15  determine what actually happened between Plaintiff and Stahl.  Rather, the Court is

16  required only to determine whether the Company's conclusion that Plaintiff had violated

17  its policies was reasonable and, if so, whether that conduct provided just cause for

18  termination.  The Court has already answered both questions in the affirmative.

19  Because Plaintiff cannot show that the Company violated the CBA, Defendants are

20  entitled to judgment.

21  ///

22  ///

23  ///

24  ///

25  ///

26  _____

27    [5] Plaintiff's argument that other employees were not fired for engaging in similarly egregious
conduct is also unpersuasive.  None of his examples included conduct that was actually on par with

28  Plaintiff's.  Pointing to Plaintiff's eleven years of service is not helpful either because it does not justify
maintaining his employment after the Company determined he violated its "zero tolerance" policies.

1

**B.     Breach of the duty of fair representation**

2          Even if that was not the case, however, the Court also concludes that Plaintiff

3   cannot show that the Union breached its duty of fair representation.  "To establish that a

4   union breached its duty of fair representation, an employee must show that the union's

5   processing of the grievance was 'arbitrary, discriminatory, or in bad faith.'"  Slevira v.

6   Western Sugar Co., 200 F.3d 1218, 1221 (9th Cir. 2000) (quoting Vaca, 386 U.S. at

7   190).  "Mere negligence on the part of the union does not constitute a breach of the duty

8   of fair representation."  Id.

9          Plaintiff contends the Union violated its duty of fair representation when:  (1) it

10  refused to pursue appointment of a fifth impartial BOA member; (2) the Union's counsel

11  based his legal opinion on the flawed investigation conducted by Russo; and (3) it failed

12  to submit Plaintiff's grievance to arbitration despite the mandatory language in the CBA.

13  The Court has already concluded that the Company's investigation was reasonable.  It

14  rejects Plaintiff's remaining arguments as well.[6]

15         In general, the Union as to opposed to the individual employee decides which

16  grievances to pursue to arbitration.  The Supreme Court has explained why:

17                  Though we accept the proposition that a union may not
                arbitrarily ignore a meritorious grievance or process it in
18              perfunctory fashion, we do not agree that the individual
                employee has an absolute right to have his grievance taken to
19              arbitration regardless of the provisions of the applicable
                collective bargaining agreement.    In [Labor Management
20              Relations Act ("L.M.R.A.")] [§] 203(d), 61 Stat. 154, 29 U.S.C.
                [§] 173(d), Congress declared that "Final adjustment by a
21              method agreed upon by the parties is the desirable method for
                settlement of grievance disputes arising over the application or
22              interpretation of an existing collective-bargaining agreement."
                In providing for a grievance and arbitration procedure which
23              gives the union discretion to supervise the grievance
                machinery and to invoke arbitration, the employer and the
24              union contemplate that each will endeavor in good faith to
                settle grievances short of arbitration.  Through this settlement

25

26         [6] Plaintiff does not appear to argue that the Union breached any duties up to the point the BOA
    deadlocked, which makes sense given that the Union zealously advocated for him until then.  The Union
27  re-assessed all of the facts gathered at that point, sought the opinion of counsel, and determined that
    pursuing the grievance in arbitration would almost certainly be fruitless, given the objective evidence
28  corroborating Stahl's allegations.  The Court agrees with that assessment as well and concludes that the
    decision to abandon the grievance was not arbitrary, unreasonable, or made in bad faith.

process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved.  And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.  See Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601 (1956).

If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.    Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration.  This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.  See NLRB v. Acme Industrial Co., 385 U.S. 432, 438; Ross, Distressed Grievance Procedures and Their Rehabilitation, in Labor Arbitration and Industrial Change, Proceedings of the 16th Annual Meeting, National Academy of Arbitrators 104 (1963).  It can well be doubted whether the parties to collective bargaining agreements would long continue to provide for detailed grievance and arbitration procedures of the kind encouraged by L.M.R.A. [§] 203(d), supra, if their power to settle the majority of grievances short of the costlier and more time-consuming steps was limited by a rule permitting the grievant unilaterally to invoke arbitration. Nor do we see substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration.  For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration.

Vaca, 386 U.S. at 191-92.  Plaintiff contends this reasoning is inapplicable here where the CBA states that in the event of a deadlocked BOA, a fifth member "shall" be chosen, and then, if no fifth member can be agreed upon, the case "shall" proceed to arbitration.

///

///

///

///

29

1    The problem with Plaintiff's argument is that it ignores the implied condition that

2  the Union has to make the decision to pursue the grievance further before invoking

3  those provisions.  The document would make no sense if it required any grievance

4  pursued to the BOA and resulting in a deadlock to then be pursued in every case all the

5  way through arbitration.  Indeed, the Union's counsel testified, and the Court quoted him

6  at great length above, as to the absurdity of this position.[7]  The Court agrees with Mr.

7  Provencher.

8    Mr. Provencher also testified that basically every arbitration provision is written

9  this way, namely utilizing seemingly mandatory terms as to the procedures to be

10 followed, but with the presumption that one party or both is electing to pursue resolution

11 of a disagreement.  Stated another way, the mandatory terms go to the procedures to be

12 followed if the Union elects to move forward, but the decision to move forward in the first

13 place remains discretionary.  The CBA in this case is an agreement between the

14 Company and the Union and the grievance provisions assume an ongoing dispute.

15 Nothing in the CBA, however, deprives the Union of the discretion to determine which

16 disputes to pursue or requires the Union to pursue disputes through arbitration even if,

17 during the course of the dispute, the Union determines a grievance is non-meritorious.  A

18 contrary interpretation would put the Union in the position of having to continue to argue

19 frivolous claims simply because the Union undertook representation before all facts were

20 uncovered.  Accordingly, because Plaintiff cannot show that the Union breached its duty

21 of fair representation, his claims fail on this ground as well.

22 ///

23 ///

24 ///

25 ///

26 _____
[7] To the extent Plaintiff argues that the Company was compelled by this contract language to
27 appoint a neutral fifth BOA member or to submit the grievance to arbitration, essentially to seek arbitration
against itself, it makes even less sense.  The Union represents Plaintiff in the grievance process and takes
an adversarial position to the Company.  Once the Union abandons a grievance, the Company no longer
28 has obligations under the CBA.

30

1

**CONCLUSION**

2

3         For the reasons stated, Defendants have shown that, based on the undisputed

4    material facts, Plaintiff cannot establish his claims as a matter of law.  Defendants'

5    Motion for Summary Judgment (ECF No. 22) is thus GRANTED.  The Clerk of the Court

6    is directed to enter judgment for Defendants and to close this case.

7         IT IS SO ORDERED.

8    Dated:  April 21, 2023

9                                    _____

10                                   MORRISON C. ENGLAND, JR.
                                     SENIOR UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28